In re Eiler Leonard HENRICKSON and Mary Susan Henrickson, Debtors.

William I. KAMPF, as trustee for Mary Susan Henrickson, Plaintiff,

v.

FIRST NATIONAL BANK OF MINNE-TONKA and Thorpe, Defendants,

Walter Zschokke, Lee Ramette, Mylla Urban, Julian Torrey, Eleanor Hanson, Mr. and Mrs. John Ellison and Patricia Lamb, Intervenors.

Bankruptcy No. 3–80–01813.
Adv. No. 80–0321.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Oct. 6, 1981.

Maury S. Landsman of Kampf, Orey, Landsman & Seesel, St. Paul, Minn., for plaintiff.

Mark G. Ohnstad of Gustafson & Adams, Edina, Minn., for defendant.

William E. Ahlberg of Ahlberg Law Firm, Ltd., Apple Valley, Minn., for intervenors.

Donald H. Seel, Richfield, Minn., for Component Investment (Thorpe).

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

JACOB DIM, Bankruptcy Judge.

The above entitled matter came on for hearing before the Honorable Jacob Dim, Bankruptcy Judge, on July 2 and 29; August 18; and September 3, 1981. The plaintiff sought a determination of the rights of the respective parties on a contract for deed, reinstatement of the contract, and damages of a cashier's check. Pursuant to an agreement among the parties reached during the trial, this order is confined to a determination of the rights and liabilities of the parties. The issue of damages has been left for a future determination.

### SUMMARY OF FACTS

The debtor, Mary Susan Henrickson, formed a limited partnership with the intervenors as limited partners and the debtor as general partner and manager. The purpose of the partnership was to own and manage as residential rental property five townhouses located in Lakeville, Minnesota. The partnership was formed throughout the later half of 1979 and the beginning of 1980. It was called "the Lakeville Five".

As manager of the partnership, the debtor opened a checking account with the Bank in August, 1979. The checking account was opened under the name of the Lakeville Five. Bank records indicate the account was given a personal, rather than a business, account number.

The residential rental property was purchased by the partnership on August 30, 1979 from Component Investment, a general partnership, (Thorpe). The purchase was by contract for deed signed by Glenn Thorpe for the seller and the debtor for the buyer. The contract required monthly payments commencing with October 7, 1979.

Almost immediately, the debtor failed to make the monthly payments when due. The seller Thorpe served a number of notices of cancellation under Minn.Stat. § 559.21 on the debtor prior to September, 1980. Each time the debtor paid all amounts due before the expiration of the

thirty (30) day notice period provided by statute. On one occasion in January, 1980, the debtor paid part of the amount due by check drawn on the Lakeville Five account. In a letter from Gary Flatten, attorney for Thorpe dated January 30, 1980, Mr. Flatten added a handwritten note which stated: "check # 1018 uncertified—conditioned on clearance of check". Mr. Flatten was authorized to receive payments under the notices of cancellation.

On September 9, 1980, a notice of cancellation was served on the debtor. On September 10, 1980, a second notice of cancellation was served on the debtor. On October 7, 1980, the debtor was served with a third notice of cancellation which added the October payment to the amount due.

On October 10, 1980, the debtor went to the Bank. She withdrew $4,800.00 from the Lakeville Five account in the form of a cashier's check made payable to "Glen Thorp". There was sufficient collected money in the account to purchase the cashier's check.

The debtor took the check to Gary Flatten's office on October 10, 1980 and gave it to a member of Mr. Flatten's staff. The debtor did not endorse nor sign the check.

On that same day, Mr. Flatten gave the check to Thorpe. Thorpe endorsed the check to Mr. Flatten in payment of amounts owed by Component Investment to Mr. Flatten. Thorpe received the remaining balance in cash from Mr. Flatten.

Mr. Flatten deposited the check in his account on October 10, 1980. The check was presented to the Bank for payment by October 16, 1980. On October 16, 1980, after the close of business, the Bank determined not to pay the cashier's check. Instead, the Bank credited the Lakeville Five account with the amount originally withdrawn. The Bank then set off amounts owed the Bank by the debtor against the money in the Lakeville Five account and against the personal account of the debtor.

The Bank, on or about October 16, 1980, contacted the debtor about a personal loan which was overdue. The debtor informed the Bank that she had or was in the process of filing for relief under the Bankruptcy Code. Title 11 of the United States Code. It was in response to the debtor's mention of bankruptcy that the Bank took the action of refusing payment on the cashier's check. The actions were taken after consultation with the attorney representing the Bank.

Mr. Flatten was informed of the Bank's refusal to honor the cashier's check. He told Thorpe. Mr. Flatten contacted the Bank to check that the Bank would not pay on the check. He, then, wrote a letter dated October 21, 1980 to the debtor informing her that, due to the failure of the Bank to honor the check, the cancellation of the contract for deed was effective.

On October 21, 1980, the debtor filed a petition for relief under chapter 7 of Title 11. The petition was dated September 21, 1980 and was signed by the debtor.

Upon the filing of the bankruptcy, the claims, rights and defenses of the debtor passed to the trustee under 11 U.S.C. § 541. The trustee assumed the position of the debtor in these transactions.

## MEMORANDUM OF LAW

There are a number of interrelated transactions which must be scrutinized: the purchase of the cashier's check; the transfer of the check to Thorpe; the transfer to Mr. Flatten; the stop payment by the Bank; and, the cancellation by Thorpe of the contract for deed. Each of these transactions gives rise to a number of issues which can lead to a variety of results for each party. To simplify discussion, these matters will be resolved as to each set of parties.

## LAKEVILLE FIVE AND THORPE

The debtor gave Thorpe the cashier's check to reinstate the contract for deed on October 10, 1980. There is no question that if no payment had been received by Thorpe, the contract for deed would have been cancelled. The question is what happens when payment is made but the cashier's check is later dishonored.

There are a number of cases which have been decided on cancellation of contracts for deed under *Minn.Stat.* § 559.21 and its predecessor statutes. These cases indicate that the courts abhor forfeiture and that where the parties intend, the contract for deed will be reinstated despite later occurrences.

There are also special rules which govern the use of cashier's checks and their role in the commercial field. These rules govern the rights and obligations of the parties involved.

When the debtor transferred the check to Mr. Flatten and received a receipt, a negotiable instrument was given for an obligation. *Minn.Stat.* § 336.3–802(1) governs the effect of using negotiable instruments to pay obligations. (See U.C.C. § 3–802 and comments)

■ The underlying obligation which was purportedly paid by the cashier's check was the amount in default under the contract for deed. Under *Minn.Stat.* § 559.21 and the cases thereunder, when the vendor on a contract for deed accepts a payment to reinstate a contract which is being cancelled, the cancellation is of no effect, and the contract is reinstated as of that date even if additional sums remain outstanding. *Odegaard v. Moe,* 264 Minn. 324, 119 N.W.2d 281 (1961). Since all three notices outstanding on October 10, 1980 were based in part on the same sums due on that date, payment on any one of the notices would make all ineffective, if the payment was accepted. Accepted payment, even if not sufficient to pay all amounts then due, would make the notices inaccurate. *Minn. Stat.* 559.21 states that a notice of cancellation, if different in amount than that specified, is ineffective.

■ The instrument taken to cure the default and reinstate the contract was the cashier's check. A cashier's check is a draft on which a bank is both the drawer and drawee. As originally drawn, the only party liable for or obligated on this check is the Bank.

336.3–802(1)(a) states that:

"Unless otherwise agreed where an instrument is taken for an underlying obligation (a) the obligation is pro tanto discharged if a bank is drawer, maker, or acceptor of the instrument and there is no recourse on the instrument against the underlying obligor"

All the criteria of this section have been met. This section governs all transactions involving checks used to pay obligations regardless of whether those obligations involve real or personal property. The clear language of the section dictates that the default in the contract for deed was cured and that result is further buttressed by the Minnesota Code Comment to this section. The comment states that the obligee who takes bank paper, Thorpe, without the debtor's endorsement is in the same position as if he took cash. *State Bank of Brooten v. American National Bank of Little Falls,* 266 N.W.2d 496 (Minn. 1978).

■ On October 10, 1980 the contract for deed was not cancelled. Prior to the time the next payment was due, the vendor indicated that the contract for deed was cancelled and that neither the Lakeville Five nor the debtor had any interest in the property. At about the same time, the debtor's interest passed to the estate under chapter 7. The trustee immediately commenced this lawsuit to determine the rights of the parties. The purported cancellation by Thorpe was wrongful, ineffective and entitles the Lakeville Five to damages or reinstatement of the contract and damages, or such other relief as the law allows.

In the intervening year, control over the real property has been in the hands of Thorpe. All rents have been paid to Thorpe and all expenses for maintenance, operation, and improvements, if any, have been paid by Thorpe. An accounting of these transactions is necessary.

### THE BANK AND THE DEBTOR (TRUSTEE)

■ The Bank asserted that it had the right to stop payment on the cashier's check because of the debtor's fraud in obtaining

it. This defense, if it exists, would be available to the Bank against the trustee in the present action. The general rule for cashier's checks is that the bank's obligation to pay is absolute. The purpose of this rule is to make cashier's checks as much like cash as possible. The role of the cashier's check in the commercial world is to provide the certainty of payment while retaining the security of a named payee. See, "Stopping Payment on a Cashier's Check" 19 Boston College Law Review 683 (1978).

Exceptions to the general rule have been limited, and they are narrowly construed. This is necessary to preserve the effectiveness of the cashier's check in commercial transactions. Fraud has been one ground for upholding a stop payment on a cashier's check. But the fraud in such cases has been fraud in the actual transaction which vitiates its very nature. Thus, where the check has not been paid for or it is turned over to the wrong party, a dishonor has been allowed.

The Bank alleges that the fraud of the debtor was her willful failure to disclose her intention to file for relief under bankruptcy law. In support of the duty to disclose, the Bank points to an application for a personal loan by the debtor dated May, 1979 in which she agreed to report any change in her financial condition.

■ The Bank's defense to payment is insufficient. Assuming that all the allegations made by the Bank are true, the Bank still will not prevail. The Bank's theory of fraud is necessarily founded on the Bank's right to set off the money in the account. The Bank did not exercise this right until after the debtor informed the Bank of the proposed bankruptcy. Set off is governed by 11 U.S.C. § 553. Under § 553(b) the trustee would have had the right to recover any set off.

Furthermore, the Bank would have had no right to set off any obligation of the debtor against the money in that account. The money in that account belonged not to the debtor but to the partnership, Lakeville Five. The Bank claims not to have known that the account was a business account.

The name of the account should have put the Bank on notice, but the knowledge or lack of it by the Bank cannot alter the fact that the money belonged to the partnership.

Simply put, the Bank reacted to the word "bankruptcy" without concern for the rights of any other party. The Bank, in its haste to act, did not consider the consequences. The Bank did not even check to see if its action was in violation of the automatic stay under Section 362 by calling to determine if the debtor had filed for relief. The Bank is liable to the trustee standing in the position of the debtor, for any damages resulting from the wrongful dishonor of the Bank. By failing to honor the check, the Bank breached its contract with the debtor and the Lakeville Five.

### THORPE AND THE BANK

■ Thorpe was the payee on the cashier's check originally. Thorpe negotiated the check to Mr. Flatten. After the dishonor by the Bank, Thorpe settled his differences with Mr. Flatten and thereby assumed his original position.

Thorpe, Flatten and Thorpe, under 336.3–302, were holders in due course. Thorpe is a holder since the check was made payable to him. He gave value by discharging the underlying obligation of the debtor. He had no notice of any defense or competing claim to the cashier's check.

As a holder in due course, Thorpe was entitled to the rights and protections of § 336.3–305. These would have prevented the Bank from asserting its fraud defense against Thorpe even if such a defense was available to the Bank.

The Bank wrongfully dishonored the cashier's check as against Thorpe and is liable to Thorpe for any damages sustained by Thorpe.

### THE INTERVENORS AND THE BANK

For the reasons set forth above, the Bank is liable to the intervenors to the same extent, it is liable to the debtor.

### THE DEBTOR AND THE INTERVENORS

No liability of the debtor to the intervenors has been proven.

### CONCLUSION

The defendant, First National Bank of Minnetonka, is liable in damages to the plaintiff, William I. Kampf as trustee for the debtor, the defendant, Component Investment (Thorpe) and the intervenors, the limited partners of the Lakeville Five.

The defendant, Component Investment (Thorpe), is liable to the plaintiff and the intervenors for reinstatement of the contract for deed and/or damages for wrongful cancellation and/or breach of the contract for deed or other lawful damages.

The question of damages and remedies is reserved until after hearing the evidence to be presented October 23, 1981.